IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PHILADELPHIA ENTERTAINMENT AND | : | |
| DEVELOPMENT PARTNERS, L.P. | : | |
| | : | |
| | : | |
| Debtor. | : | Case No. 14-12482 (MDC) |

**UNITED STATES TRUSTEE'S AMENDED OBJECTION TO APPLICATION OF DEBTOR TO EMPLOY DLA PIPER LLP (US) AS BANKRUPTCY COUNSEL PURSUANT TO SECTION 327(a) OF THE BANKRUPTCY CODE**

A.    **Background**

The United States Trustee ("United States Trustee" or "UST"), by and through counsel, files this Amended Objection to the Application of Debtor to Employ DLA Piper LLP (US) ("DLA") as Bankruptcy Counsel Pursuant to Section 327(a) of the Bankruptcy Code. The United States Trustee represents the following:

1.    Roberta A. DeAngelis is the United States Trustee for this jurisdiction.

2.    The United States Trustee is responsible for the supervision and administration of all cases filed under Chapter 11 of the Bankruptcy Code. The United States Trustee has the authority and standing to monitor applications filed under 11 U.S.C. § 327 of title 11 and, whenever the United States Trustee deems it appropriate, filing with the Court comments with respect to the approval of such applications. 11 U.S.C. §§ 307, 327; 28 U.S.C. § 586.

3.    The Debtor filed a petition for relief under Chapter 11 on March 31, 2014.

4.    The Debtor filed an Application seeking approval of the employment of DLA to act as bankruptcy counsel pursuant to 11 U.S.C. §  327(a) on April 7, 2014 ("Application").

1

5. On May 9, 2014, the UST filed an Objection to the Application and this Court commenced a hearing on May 14, 2014. Counsel for the United States Trustee reported that additional information was recently obtained from DLA regarding the accuracy of DLA's representations and disclosures in support of the Application and requested an adjournment of the hearing to allow additional time to conduct discovery on the matter.

6. Through subpoenas, the UST sought discovery from DLA, the Debtor, and limited partners of the Debtor. The UST took the deposition of Brian Ford, the representative of the Debtor. Brian Ford also appeared and testified as the representative of Washington Philadelphia Investors, L.P. and Washington Philadelphia Investors I, L.P., the limited partners of the Debtor. While receiving some documents, DLA heavily redacted those documents. Further, DLA asserted that it was withholding documents because of privilege but refused to provide a privilege log.[1]

7. The United States Trustee incorporates the allegations set forth in the original objection.

8. DLA filed the Application on April 7, 2014, and attached as Exhibits the Engagement Letter ("Engagement") between DLA and the Debtor and the Declaration of Thomas Califano, a partner and Co-Vice Chair, Restructuring Practice Group ("Califano Declaration").

9. On May 12, 2014, in response to the UST's Objection, DLA filed a Motion for Leave to File a Reply in Support of the original Application and attached a Declaration by DLA partner Stuart Brown ("Brown Declaration"). Also attached were documents purportedly in support of the prior representations, including copies of two wire transfers attached hereto as UST *Exhibit 1*.

---

[1] Ultimately a privilege log was produced several weeks later.

10. Upon information and as set forth below, DLA made material, inaccurate and misleading representations in the Application and in Declarations and Exhibits attached in support of the Application. DLA continued making material, misleading and inaccurate representations in the Brown Declaration.

11. Upon information and as set forth below, DLA received payment of fees from the Debtor within 90 days before the bankruptcy filing that may have constituted a substantial avoidable preference and that DLA's receipt of the payments constitutes either a conflict of interest or material interest adverse to creditors and the estate.

12. 11 U.S.C. § 327(a) states:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

13. Attorneys selected to represent debtors under section 327(a) of the Bankruptcy Code may not be persons who "hold or represent an interest adverse to the estate," and must be "disinterested persons." *In re Pillowtex, Inc.,* 304 F.3d 246, 250, (3d Cir.2002). The Bankruptcy Code defines a "disinterested person," as someone who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor…, or for any other reason." 11 U.S.C. § 101(14)(E).

14. 11 U.S.C. §329(a) states:

Any attorney representing a debtor in a case under his title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services

rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

15. Rule 2016(b) of the Federal Rules of Bankruptcy Procedure states:

Disclosure of Compensation Paid or Promised to Attorney For Debtor. Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by §329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

16. Upon information as set forth below, DLA failed to disclose that the firm received

fees in connection with the sale of the Debtor's real estate on March 27, 2014.

### B. DLA Made Material Inaccurate and Misleading Statements in the Application and Supporting Declarations

17. Paragraph 17 in the Califano Declaration attached to the Application states:

DLA has provided and agrees to continue to provide assistance to the Debtor in accordance with the terms and conditions set forth in the Application and Engagement Letter. Prior to the Petition Date, DLA received funds from certain of the partners of the Debtor in the aggregate amount of $550,000.00, which was deposited into a client trust account (the "Trust Account"). In accordance with the Plan, an additional $150,000.00 was received from RBS Citizens from the proceeds of the sale of real property owned by the Debtor and deposited into the Trust Account. The amounts DLA has invoiced the Debtor for professional services and/or the reimbursement of reasonable and necessary expenses incurred in connection therewith are set forth in the chart below, and such amounts were paid from funds on deposit in the Trust Account.

18. Paragraph 5 of the Engagement Letter dated October 31, 2013 between DLA and

the Debtor states:

Retainer. The Firm will require a security retainer in the amount of $550,000. which is our estimated fees plus costs (these estimates do not include any out-of pocket expenses). We will deposit the retainer in the Firm's client trust account. We acknowledge receipt of $525,000 to date. The retained funds will remain your property unless and until we apply them as charges for services as we render them. If, for any

4

reason, you do not promptly pay any Firm invoice relating to this matter, the Firm may, in its sole discretion, apply available funds in the retainer account to your past-due balance. At the conclusion of our engagement, after payment of all other amounts due, the Firm will return any remaining balance of your retainer in the account to you.

19. The Engagement Letter expressed that on October 31, 2013 DLA received payment of $525,000 of an estimated fee of $550,000.

20. The UST avers that the amount of the payment received was materially inaccurate. DLA received into its operating account one electronic wire transfer on October 9, 2013 in the amount of $211,951.00 from the Rubin Family Charitable Trust. DLA also received into its operating account a second electronic transfer on October 10, 2013 in the amount of $101,098.00 from Edward Snyder, for a total payment to DLA of $313,049.00 made prior to October 31, 2013.

21. Only after the UST identified the inaccurate amount, did DLA represent in Brown's submission that the Engagement Letter was inaccurate with respect to the amount of payments received.

22. DLA continues to fail to satisfactorily explain why the amount identified in the Engagement Letter was inaccurately stated. Further, DLA has not satisfactorily explained why the Califano Declaration failed to accurately disclose the amount received prior to October 31, 2013; and these failings continue to date.

23. The Engagement Letter states in paragraph 4 that "DLA will deposit the retainer in the firm's client trust account." The Califano Declaration also states that $550,000.00 was deposited in a client trust account.

24. The UST avers that this statement was not merely misleading, but a misrepresentation of facts known to DLA. In fact, payments made to DLA were placed in DLA's Operating Account and not a client trust account.

25. The copies of the wire transfers attached as UST Ex-1, identify the sender and the amount of the wire transfer sent to DLA.[2] Each of the wire transfers also indicate that the transfers were deposited to DLA's Operating Accounts, and not deposited in the DLA Client Trust Account.

26. Paragraph 10 of the Brown Declaration states: "Both payments were effected by wire transfer *directly* to the Trust Account." *(emphasis added)* This misstatement is wholly inexplicable given that copies of the wire transfers were attached to the Brown Declaration.

27. Upon information, DLA eventually moved funds from its operating account to a client trust account.

28. DLA has failed to provide a sufficient explanation why funds paid to DLA on behalf of a client were not directly placed in a client trust account upon receipt in apparent contradiction of the terms of the Engagement Letter, as well as in apparent breach of the Attorney Rules of Professional Conduct.

29. DLA has failed to provide a sufficient explanation why both the Califano and Brown Declarations include material misrepresentations.

30. The Califano Declaration at paragraph 17 states: "Prior to the Petition Date, DLA received funds from certain of the partners of the Debtor in the aggregate amount of $550,000.00, which was deposited into a client trust account.

---

[2] The UST notes that the documents in this Exhibit are barely legible and probably redacted, though there is no reference to a redaction on the document.

    a.    The UST avers that this is also a material misrepresentation. DLA did not receive funds from "certain partners of the Debtor."

    b.    Upon information, DLA received funds from the following persons or entities on or about the following dates:

| Date | Amount | From |
|---|---|---|
| October 9, 2013 | $211,951.00 | Rubin Family Charitable Trust |
| October 11, 2013 | $101,098.00 | Edward Snyder |
| November 12, 2013 | $ 25,000.00 | Philadelphia Entertainment and Development Partners, L.P. (Debtor) |
| December 24, 2013 | $211,951.00 | Interstate Outdoor Advertising (On behalf of Silver Family Charitable Trust) |
| Total | $550,000.00 | |

    c.    The funds received on December 24, 2013 were by wire transfer attached hereto as *UST Exhibit 2*. Like the two previous wire transfers, these funds were deposited in DLA's Operating Account and not to a client trust account.

    d.    DLA failed to identify in the Califano Declaration the persons and entities who paid the funds to DLA. Further, DLA failed to satisfactorily explain why the persons and entities who made the wire transfers were not identified.

    f.    DLA failed to adequately disclose whether DLA has any connections with the persons and entities who made payments to DLA on behalf of the Debtor.

    31.    On November 12, 2013, the Philadelphia Entertainment and Development Partners, L.P., (Debtor) paid DLA $25,000.00 by a check drawn on a bank account held and controlled by the Debtor. A copy of the check is attached hereto as *UST Exhibit 3*.

    a.    Upon information, DLA now disputes that its client, the Debtor, had any

7

ownership of the $25,000.00 in funds that were used to pay DLA on that date. Rather DLA asserts that the funds were owned and controlled by the Debtor's partners.

      b.      The Engagement Letter states, in pertinent part, "<u>The retained funds will remain your property</u> unless and until we apply them as charges for services as we render them." *(emphasis added)*

      c.      DLA has failed to adequately explain why the funds received in this transfer and the funds received in the previously identified transfers might belong to any party other than the Debtor.[3]

### C. DLA Paid Itself an Avoidable Preference and Created a Conflict of Interest or, an Interest Materially Adverse to Creditors or the Estate

32.      Paragraph 18 of the Califano Declaration includes a chart disclosing information setting forth the dates and amounts that DLA paid itself from the funds it held on behalf of the debtor.[4]

| Invoice Date | Billed Amount | Payment Date | Amount of Funds Applied from Trust Account |
|---|---|---|---|
| 11/12/2013 | $42,470.65 | 3/31/2014 | $42,470.65 |
| 12/7/2013 | $74,343.33 | 12/26/2013 | $74,343.33 |
| 1/31/2014 | $41,736.84 | 3/31/2014 | $41,736.84 |
| 2/12/2014 | $100,482.67 | 3/31/2014 | $100,482.67 |
| 3/27/2014 | $54,539.50 | 3/31/2014 | $54,539.50 |
| 3/31/2014 | $50,000.00 | 3/31/2014 | $50,000.00 |

---

[3] Moreover, repeated representations were made that none of the monies received were debtor's property. The Engagement Letter clearly sets forth that the money received was to be considered property of the debtor.

[4] The chart representing payments to DLA in paragraph 18 is identical to the charts in DLA's 2016(b) Statement and Amended 2016(b) Statement.

8

        a.        Based on this chart, DLA discloses it paid itself a total of $363,572.99 of which $289,229.66 was paid within 90 days of the petition date, and in fact, paid on March 31, 2014, hours before the filing of the bankruptcy petition.

        b.        In the Engagement Letter dated October 31, 2013, DLA set forth its terms with respect to DLA's fees and costs. Paragraph 4 states in pertinent part:

> We customarily send monthly invoices for services rendered and other charges incurred for your account during the previous month. The monthly invoice details the work performed and the types of charges incurred. Payment is due upon receipt of our invoice.

        c.        The language in the Engagement Letter describes DLA's ordinary course of business with respect to payment, billing and due date for payment of fees for services rendered.

        d.        Upon information, the invoice dates and dates of payment reflect that at least $234,690.16 was paid to DLA outside DLA's ordinary course of business and on account of an antecedent debt. [5]

33.        As identified in the chart, DLA paid itself $50,000.00 on March 31, 2014. Upon information, there was no invoice issued on that date. Rather, DLA decided to pay itself an amount that it estimated it was owed so that DLA would not be rendered a creditor.

34.        DLA asserts that it had a security interest in the funds received as a retainer.

        a.        DLA has not provided sufficient evidence that DLA had a security interest in the funds. To the contrary, the UST believes that when the funds were deposited in DLA's Operating Account (instead of the Client Trust Account), the alleged security interest was extinguished. Alternatively, when Debtor paid Brian Ford monies from the Trust Account and when the

---

[5] The UST calculates this amount by taking all payments identified on the chart and subtracting the 12/26/13 payment of $74,343.33 and the 3/27/14 payment of $54,539.50, which the UST allows for an arguable defense for payments under the ordinary course exception.

9

$150,000.00 from RBS Citizens was deposited into the trust account, the commingling of debtor's funds for the business operations extinguished any security interest in the funds in the account.

35. Based on the facts presented, the UST believes a *prima facie* preference claim is established and that DLA is a creditor of the Debtor and holds an adverse interest to the creditors and the estate. See Pillowtex, supra. at para. 13.

36. Alternatively upon information, DLA paid itself in excess of what was owed and owes a refund to the debtor.

   a. The bottom row of DLA's chart indicates that DLA paid itself $50,000.00 on March 31, 2014 on a "billed" amount of $50,000.00 with the invoice date of March 31, 2014.

   b. Upon information, DLA did not disclose on the chart that it paid itself an additional $71,579.93 on March 31, 2014.

   c. Upon information, there was no invoice dated March 31, 2014. DLA "estimated" how much it could be owed for services rendered and paid itself a total of $121,579.93 immediately prior to the petiton date.

37. DLA has not produced documentation which demonstrates that it provided the Debtor with notice that it would pay itself this amount as required by the Engagement Letter.

38. Upon information, DLA paid itself at least $435,153.07 prior to the petition date from debtor funds which exceeds the amount owed for services performed.

   **D.   DLA Failed to Disclose Compensation Received**

39. On or about March 27, 2014, the Debtor sold its ownership interest in real property located at 1499 Christopher Columbus Boulevard for $15,000,000.00.

40. The Califano Declaration and other documents filed by the Debtor indicated that

10

RBS Citizens, an alleged secured creditor of the debtor, agreed to the sale and further agreed to give $150,000.00 of the proceeds received from the sale to the Debtor.

41. The Califano Declaration and the Application indicated that DLA agreed to provide services to the Debtor in connection with negotiation with RBS regarding the sale of its real estate and the disposition of the proceeds from any sale.

42. DLA refused to provide the UST with a copy of the settlement sheet evidencing the real estate transaction.

43. The UST obtained a copy of the settlement sheet from RBS Citizens' counsel.

44. The settlement sheet reveals that DLA received compensation of $7,400.00 in connection with the sale of the Debtor's real estate.

45. Upon information, the compensation paid to DLA disclosed on the settlement sheet was for DLA's representation of a party who financed the purchase of the real estate by the buyer.

46. The UST avers that DLA failed to disclose payments made to DLA for services rendered in connection with the sale of the Debtor's real estate.

### E. Conclusion

47. Disclosures made under 11 U.S.C. Section 329(a) and Federal Rule of Bankruptcy Procedure 2016(b) must be "precise and complete, with no excuses, such as inadvertence, neglect or ignorance." *In re Ressler Hardwoods & Flooring, Inc. 2011 WL4458779 (M.D.Pa.2011),* citing *In re Berg,* 356 B.R. 378, 381 (Bankr.E.D.Pa.2006) (quotations and citation omitted); *see also Neben & Starrett v. Chartwell Fin. Corp. ( In re Park–Helena Corp.),* 63 F.3d 877, 881 (9th Cir.1995) (noting that "coy or incomplete disclosures" are insufficient).

Disclosure of pre-petition payments on a debtor's statement of financial affairs does not satisfy the disclosure requirements of § 329 and Rule 2016(b). *See Jensen v. United States Trustee ( In re Smitty's Truck Stop, Inc.),* 210 B.R. 844, 849 (10th Cir.1997). If pre-petition payments are not fully disclosed, all compensation may be denied. *See* id. at 848 *(citing In re Investment Bankers, Inc.,* 4 F.3d at 1565); *Quiat v. Berger (In re Vann),* 136 B.R. 863, 873 (D.Colo.1992) (noting that abundant case law supports the total denial of fees for non-compliance with Rule 2016(b); *In re Maui 14k, Ltd.,* 133 B.R. 657, 660 (Bankr.D.Haw.1991). Compensation may be denied for failure to disclose under § 329 "regardless of actual harm to the estate." *In re Maui,* 133 B.R. at 660 (citing *In re Futuronics Corp.,* 655 F.2d 463, 471 (2d Cir.1981)).

48.     Professionals may be disqualified from representing a debtor where the professional has failed to comply with professional state ethical obligations. See paragraph 28. *In re Universal Building Products,* 486 B.R. 650, 661(Bankr.D. Del.2010), citing *Berger McGill, Inc. v. Capozzoli (In re Berger McGill, Inc.),* 242 B.R. 413, 423 (Bankr.S.D.Ohio 1999) (disqualifying law firm from representing debtor in action against creditor/former client where creditor had previously consulted and provided confidential information to counsel about the subject of the law suit); *In re Soulisak,* 227 B.R. 77, 80 (Bankr.E.D.Va.1998) ("Attorneys who practice before a bankruptcy court must not only concern themselves with the obligations set forth in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, but also with the application of state ethical rules."); *In re RKC Dev. Corp.,* 205 B.R. 869, 873 (Bankr.S.D.Ohio 1997) (concluding that appointment under § 327 should be refused where retention is at variance with ethical and disciplinary rules); *In re Sauer,* 191 B.R. 402, 407 (Bankr.D.Neb.1995) (disqualifying counsel for failure to observe applicable state ethics code).

49. Violations of the requirements of 11 U.S.C. § 329 and Federal Rules of Bankruptcy Procedure 2014 and 2016 justifies disqualification of a professional and denial of compensation, "regardless of whether the undisclosed connections or fee arrangements were materially adverse to the interests of the estate or were de minimis." *In re EWC, Inc.,* 138 B.R. at 280 (citing cases); *see also* In re Hot Tin Roof, Inc., 205 B.R. at 1003; *In re Waldo,* 417 B.R. 854, 893–94 (Bankr.E.D.Tenn.2009) (observing that bankruptcy courts have "inherent power to sanction parties for improper conduct"); *In re Vann,* 136 B.R. at 873 (observing that abundant case law allows a bankruptcy court to deny all fees for failure to comply with Rule 2016(b)).

50. DLA did not accurately disclose all fees paid by the Debtor.

51. DLA made material misrepresentations in the Application and Declarations.

52. DLA placed client funds directly in its operating account in apparent breach of the Attorney Rules of Professional Conduct.

53. DLA is not disinterested and holds a materially adverse interest to creditors and the estate.

WHEREFORE, the United States Trustee requests that the Application be **denied** and all fees be disgorged.

        Respectfully submitted,

        ROBERTA A. DeANGELIS
        UNITED STATES TRUSTEE
        Region 3

**BY:**   */s/ Kevin P. Callahan*_____
        Kevin P. Callahan
        Trial Attorney
        Office of the U.S. Trustee
        833 Chestnut Street, Suite 500
        Philadelphia, PA 19107
        Tel: 215-597-4411

Dated: June 12, 2014